UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-80760-CIV-MATTHEWMAN

TINA MARIE OGLESBY,

      Plaintiff,

v.

CAROLYN W. COLVIN[1],
Commissioner of Social Security
Administration,

      Defendant.

_____/



## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DEs 20, 21]</u>

THIS CAUSE is before the Court upon Plaintiff, Tina Marie Oglesby's ("Plaintiff")

Motion for Summary Judgment [DE 20], and Defendant, Carolyn W. Colvin, Commissioner of

Social Security Administration's ("Defendant") Motion for Summary Judgment [DE 21]. The

parties have consented to magistrate judge jurisdiction. [DE 16]. The issue before the Court is

whether the record contains substantial evidence to support the denial of benefits to the Plaintiff

and whether the correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701

(11th Cir. 1988).

---

[1] As of January 23, 2017, Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* Social Security Administration, *The Acting Commissioner of Social Security*, https://www.ssa.gov/agency/commissioner.html. However, for consistency, the Court will continue to use the party named in the Complaint, Carolyn W. Colvin. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. <u>FACTS</u>

On July 3, 2013, Plaintiff filed an application for supplemental security income, asserting a disability on-set date of January 1, 2003. [R. 21].[2] She later amended the on-set date to July 3, 2013. [R. 38]. The claim was denied initially and upon reconsideration. [R. 21]. Following a video hearing on April 21, 2014, the ALJ issued a decision on October 21, 2014, denying Plaintiff's request for benefits. [R. 18-30]. A request for review was filed with the Appeals Council and denied on March 9, 2016. [R. 1-6].

Plaintiff was born on December 20, 1968, and was 44 years old on the date that the ALJ issued her decision. [R. 28]. Plaintiff's highest level of education is a GED with a CNA certification and attendance at a cosmetology school for one year. [R. 42].

## A.  Hearing Testimony

The ALJ held a video hearing on April 21, 2014. [R. 37]. Plaintiff testified that she lives in a house with her teenage daughter and that her older daughter comes twice a day to help out with daily tasks she cannot complete. [R. 40]. Plaintiff's older daughter has been helping her since Plaintiff had her neck fusion surgery approximately three years prior. [R. 40-41]. Plaintiff is divorced and is a CNA. [R. 42]. She also went to school for a year to learn how to do hair and nails. *Id.* Plaintiff's weight has been increasing because she is no longer as active as she used to be. *Id.*

Plaintiff explained that she has not worked at all since July 2013. [R. 42]. She most recently worked as an assistant manager at Wal-Mart for a few years up until 2003. *Id.* Prior to her job at Wal-Mart, Plaintiff was a nail tech for approximately five years. [R. 43]. She also co-owned an auto detailing business on and off for eight years to make part-time income. *Id.*

---

[2] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 15.

Plaintiff cleaned the inside of the cars and handled no paperwork. [R. 44]. She ultimately stopped working after she was involved in a bad car accident in 2003. *Id.* Plaintiff received a total of $100,000 as a settlement for the accident, but only ended up with $30,000 in her pocket. *Id.*

On an average day, Plaintiff gets up, does chores, goes to the grocery store, gets herself ready, spends some time with her teenage daughter, and prepares meals, but she has to lie back down every 15-20 minutes due to her neck damage and nerve damage going down her legs and hands. [R. 45]. She lets her dogs out back because she cannot walk them anymore. *Id.* Plaintiff spends about 75% of the day from 9 a.m. to 5 p.m. lying down because her neck burns, and the burning sensation goes up to her ears and hits her head. [R. 46]. Plaintiff used to be very active with her daughters, but now her daughters have to do a lot of the housekeeping. [R. 46-47].

Plaintiff testified that her 2010 surgery made her totally disabled because the doctor, Dr. Heldo Gomez, broke two discs going down her spine. [R. 47, 50]. The ALJ noted that there were no surgical reports, doctor's notes, or other records regarding the 2010 surgery in the record. [R. 48-49]. Plaintiff's attorney promised to obtain and submit the documents. *Id.* Plaintiff testified that Dr. Robert Simon had been her treating physician at the time of the surgery, and the ALJ stated that she needed Dr. Simon's records as well. [R. 50]. According to Plaintiff, Dr. Simon performed surgeries on her too.[3] *Id.*

Plaintiff stated that she currently has pain in her neck that goes up to her ears and that she has nerve damage going down her legs and in her hands and arms. [R. 51]. Lying down and using ice packs, heating pads, and "those patches that you put on you" help reduce the pain. [R. 52]. Plaintiff takes Dilaudid, MS Cotin, Flexeril, and Soma for the pain. *Id.* The Soma makes

---

[3] No records from Dr. Simon appear in the record that was submitted to the Court.

her dizzy, so she has reduced the dosage. *Id.* Plaintiff has been on and off narcotic pain medications for eight years. *Id.* Plaintiff had shoulder surgery years ago, and her shoulder is still "messed up." [R. 53].

Plaintiff explained that she can only wear certain styles of clothing and shoes due to her physical pain. [R. 53]. For example, she has trouble with buttons, zippers, and shoe laces. *Id.* Plaintiff also has trouble sleeping at night and generally only gets approximately three hours of sleep a night. *Id.* Plaintiff uses a travel pillow to keep her neck straight and reduce the burning pain by half. [R. 54]. She can only sit or stand for about 15-20 minutes before nerve pain starts shooting down her legs, her neck begins burning, and she gets earaches and headaches. *Id.* Plaintiff can only walk for a couple of minutes because the back of her legs begin to hurt. [R. 55]. She can lift about 30 pounds. *Id.* Plaintiff used to participate in social activities and hobbies, such as traveling and swimming at the beach, but she cannot anymore. [R. 55-56]. She experiences pain if she drives for too long. [R. 56].

Plaintiff testified that she has had problems with her hands for the last couple of years. [R. 59]. Her hands go numb and radiate pain that shoots down both her left and right arms. *Id.* Plaintiff's fingertips are always numb. *Id.* Plaintiff also has trouble with her balance for about 50% of each day. [R. 60].

The ALJ questioned Plaintiff about why there was a gap in her treatment from Dr. Berman between 2010 and 2011. [R. 60]. Plaintiff explained that she had only been seeing Dr. Berman for pain management for about a year and a half, and that Dr. Hoffman had been her pain management doctor before that. [R. 61]. Dr. Berman was the only doctor she saw for the two years prior to the hearing. [R. 63]. Plaintiff did not continuously see Dr. Gomez because he just did surgeries and post-op visits. *Id.* Plaintiff stated that she does drive, but only to the market

4

and only approximately twice a week. [R. 63]. Otherwise, her daughter or her daughter's father drives her around. *Id.* In 2012, Plaintiff had an online business, which was more of a hobby, with her older daughter buying and reselling hand bags online. [R. 64].

Steven Coon, the vocational expert, testified at the hearing. [R. 65]. The ALJ first posed a hypothetical in which an individual of the same age, education, and work experience as Plaintiff had the following limitations: work at the light level only; occasional stooping, kneeling, crawling, crouching and climbing; climbing ramps and stairs, but not ladders, ropes or scaffolds; avoiding hazards such as heights; and occasional overhead reaching. [R. 66]. The vocational expert explained that such an individual would be able to perform work as both a retail supervisor and a nail technician as both jobs are generally performed. *Id.* He stated that such an individual could also perform light, unskilled work as, for example, a production assembler, a cleaner, or a fast food worker. [R. 67]. The vocational expert testified that the general employer off-task tolerance for a typical workday would be about 20%. *Id.* He also testified that two or greater absences per month would impact the ability to maintain work. [R. 68].

The ALJ posed a second hypothetical in which an individual had the same limitations stated before but was also limited to frequent handling and frequent fingering (rather than constant handling or fingering). [R. 68]. The vocational expert testified that such an individual would still be able to perform the retail supervisor job, but would not be able to perform the nail technician job. *Id.* Such an individual would also be able to perform the cleaner and the assembler jobs, but not the fast food worker job. *Id.*

Plaintiff's counsel asked the vocational expert whether, if the handling and fingering were reduced down to occasional, the individual would be able to perform any of the jobs. [R. 69]. The vocational expert stated that such an individual would not be able to perform the retail

5

supervisor, nail technician job, assembler, cleaner, or fast food worker jobs. *Id.* Upon questioning by Plaintiff's counsel, the vocational expert also testified that an individual who needed a 15-minute break every hour would not be able to maintain work as it is generally performed in the national economy. *Id.*

## B. Medical Record Evidence

In reaching her decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized chronologically below.

Plaintiff was involved in a motor vehicle accident in 2003 in which she injured her cervical spine. [R. 261]. She was involved in a second motor vehicle accident on October 4, 2006. [R. 262]. Plaintiff was involved in a third motor vehicle accident on December 7, 2007. [R. 261]. She developed neck pain and lower back pain and was treated with physical therapy, chiropractic treatment, medications, and cervical and lumbar epidural injections. *Id.*

On July 16, 2009, Plaintiff had MRIs of the cervical spine and lumbar spine conducted. [R. 354]. MRIs of the cervical spine revealed extruded disc herniation at the C5-6 level, mild disc space narrowing with residual hydration in the disc, a posterior subligamentous extrusion/herniation of the disc seen centrally with the disc extending into the collar direction by approximately 6 mm from the disc space, patent neural foramina, and a bulging disc at C4-5. *Id.* The MRI of the lumbar spine revealed a bulging disc at L5-S1 with mild disc dehydration at L5-S1, mild neural impingement to the left existing nerve root, and a posterior bulge seen at L5-S1 centrally with mild encroachment on the left exiting S1 nerve root. [R. 355].

Plaintiff presented to Dr. Heldo Gomez, Jr., a neurological surgeon, on August 27, 2009, complaining of cervical pain and back pain. [R. 353]. She reported a visual analogue scale score of 6-7/10 for cervical pain for that specific day and a score of 8-9 for her worst days. *Id.* Dr.

6

Gomez noted that Plaintiff had a normal gait. [R. 354]. Upon an examination of Plaintiff's cervical spine, Dr. Gomez found that the cranial nerves were intact without deficit, the range of motion was full with discomfort, the axial loading was mildly positive with light compression less than one pound, the Spurling and Hoffmann signs were negative, the muscle strength testing was 5/5, sensation was equal and intact without deficit in the upper extremities, there was tenderness palpated in the right trapezius, scalene, and levator scapula, and the deep tendon reflexes were 2 at the biceps, triceps, and brachioradialis bilaterally. *Id.* Upon examination of Plaintiff's lumbar spine, Dr. Gomez found that the range of motion was full with discomfort at the extremes, straight leg raising was positive past 70 degrees eliciting pain in the erector spinae bilaterally, heel-toe was positive for eliciting pain, muscle strength testing was 5/5, sensation was equal and intact without deficit to the lower extremities, there was tenderness palpated across the erector spinae at L4-5 and L5-S1, and there was tenderness at the beltline with very light touching and palpation. *Id.* Dr. Gomez noted that he would try to obtain some of Plaintiff's other medical records and would have Plaintiff return in two to three weeks. [R. 350].

On November 2, 2009, Plaintiff returned to Dr. Gomez for a follow-up. [R. 346]. She continued to complain of neck pain radiating into the upper extremities, particularly on the left side, and numbness in the left hand. [R. 346]. Dr. Gomez noted that Plaintiff was describing symptoms in the left C6 distribution and that Plaintiff's MRI showed evidence of disc displacement at C4-5, C5-6. *Id.* He recommended that Plaintiff undergo an anterior C4-5, C5-6 decompression, fusion, and anterior instrumentation. *Id.*

On January 26, 2010, Plaintiff underwent surgery—an anterior C4-5, C5-6 decompression, fusion, and anterior instrumentation. [R. 343-45]. On February 16, 2010, Plaintiff had a postoperative lateral cervical spine film completed. [R. 342]. It was determined that Plaintiff's

7

anterior plate was intact from C4 through C6, that there had been no displacement of the plate from the anterior surface of the vertebral bodies, that the PEEK spacers were in good position at C4-5, and that there had been a slight subsidence at C5-6.  *Id.*

On February 16, 2010, Plaintiff saw Dr. Thomas Rousch for a follow-up post-surgery.  [R. 341].  She reported mild discomfort in the neck area.  *Id.*  Plaintiff also reported that she had been improving with stiffness in the cervical area and had no radicular symptoms, numbness, or tingling.  *Id.*  Dr. Rousch noted that the incision was healing, muscle strength and grip strengths were normal, and sensation was equal and intact in the upper extremities.  *Id.*

On March 17, 2010, Plaintiff saw Dr. Gomez for a follow-up.  [R. 338].  She complained of an ache-like sensation over the C7-T1 spinous process, a sensation of swelling overlying this region and just to the right of the midline, and occasional sensory dysesthesias in the left biceps, left antecubital region.  *Id.*  After a physical examination, Dr. Gomez noted that Plaintiff's scar was well healed, her range of motion of the cervical spine was slowly improving, her strength was 5/5 bilaterally, her gait was normal, and she had tenderness overlying the spinous process of C7-T1.  *Id.*

On May 25, 2011, Plaintiff presented to Dr. Joshua Levy for pain management of her neck and low back pain.  [R. 335].  Dr. Levy explained that, after Plaintiff's 2007 car accident, she received chiropractic treatment, pain management procedures, and left knee and shoulder surgeries.  *Id.*  Dr. Levy noted that Plaintiff had no obvious pain with her gait, a steady stance, palpation, tenderness, and positive spasms of the cervical and lumbar spines, limited range of motion of the cervical and lumbar spines guarded by pain, a negative bilateral straight leg raise test, sensation paresthesias in both arms, full range of motion in her upper extremities, 5+/5 strength test for her upper extremities, and normal range of motion and normal strength and tone to

8

her lower extremities. [R. 336]. Dr. Levy diagnosed Plaintiff with cervicalgia, displacement of cervical intervertebral disc without myelopathy, lumbago, displacement of lumbar intervertebral disc without myelopathy, other internal derangement of the knee, and a rotator cuff tear. *Id.* He changed Plaintiff's medications. *Id.*

On August 8, 2011, Plaintiff had an MRI of the cervical spine performed. [R. 264]. The radiologist determined that there was evidence of previous anterior and interbody fusion at C4-C5 and C5-C6; the C3-C4 and C4-C5 disc space levels demonstrated previous anterior and interbody fusion; there was no herniated disc, spinal stenosis, or abnormal neural foramina at the C3-C4 or C4-C5 disc space levels; the T3-T4 disc space level demonstrated a central herniated disc protrusion measuring 2 mm x 2 mm in size that did not indent the cord; there was no spinal stenosis or abnormal foramina at the T3-T4 or T4-T5 disc space levels; and the T4-T5 disc space level demonstrated a bilobular herniated disc protrusion with right paracentral and left paracentral components measuring 2 mm x 3 mm in size that did not indent the cord. [R. 264-65].

On September 8, 2011, Plaintiff presented to Dr. Gomez. [R. 261]. Plaintiff complained of pain over the left clavicle and left pectoral region, as well as posterior neck pain. *Id.* Plaintiff also described symptoms of discomfort over the right supraclavicular region. *Id.* She stated that her Visual Analogue Scale pain had been a 5/10 six months ago, but that it was currently a 7/10. *Id.* Dr. Gomez noted that Plaintiff had been under the care of a pain management specialist, Dr. Hoffman. [R. 262].

Dr. Gomez performed a physical examination on Plaintiff. [R. 262]. He noted palpable increased tone and tenderness in the paraspinal muscles in the posterior cervical region, increased tone and tenderness over the medial trapezius and supraclavicular region, tenderness over the left upper pectoral region and pectoral-deltoid groove, diminished range of motion with abduction on

9

the left shoulder, and an inability to fully abduct her left shoulder. *Id.* Dr. Gomez also noted that Plaintiff's gait was normal, her scar was well-healed, her biceps, triceps, and interosseous strength was 5/5 bilaterally, and her motor testing was 5/5 in both lower extremities. *Id.* Dr. Gomez determined that Plaintiff had reached maximal medical improvement. *Id.* He explained that the most recent MRI showed a satisfactory fusion of C4 through C6, there was no residual spinal cord compression from C4 through C6, and the adjacent segments of C3-4 and C6-7 showed no evidence of adjacent-segment degeneration. [R. 263].

On February 29, 2012, Plaintiff had a lateral cervical spine x-ray performed. [R. 329]. She was determined to have no compression fracture deformities, no lytic or blastic bone lesions, mild anterior osteophyte formation at C3-4, and normal prevertebral soft tissues. *Id.*

Plaintiff saw Dr. Gomez again on March 12, 2012, for a follow-up. [R. 328]. Plaintiff complained of a neck ache, neck soreness and stiffness, and lower back pain. *Id.* Dr. Gomez noted that Plaintiff had a solid fusion of C4 through C6, an intact anterior instrumentation, and heterotopic ossification and calcification along the anterior annulus and anterior longitudinal ligament at C3-4. *Id.* After a physical examination of Plaintiff, Dr. Gomez also noted that Plaintiff had increased tone and tenderness over the posterior cervical, trapezius, and suprascapular region, but she had motor testing of 5/5 in the upper and lower extremities and a well-healed anterior cervical scar. *Id.*

Plaintiff presented to Dr. Gerald Hoffman on July 10, 2012. [R. 294]. She reported diminished pain (a 5/10) and improved activities of daily living when she took her medications. *Id.* Plaintiff reported being self-employed and being able to work. *Id.* She reported no adverse side effects from the medications. *Id.* On September 5, 2012, Plaintiff again reported diminished pain and improved activities of daily living when taking her medications. [R. 293]. She also

10

reported no adverse side effects from the medications. *Id.* On November 27, 2012, Plaintiff reported that her medications continued to provide relief, that she had a good month, that she could conduct her online business, and that her pain was a 4 out of 10 with medication. [R. 291]. She denied any adverse effects from the medications and stated that she could carry out her daily activities. *Id.*

Plaintiff saw Dr. Bruce Berman on multiple occasions from January 3, 2013, through July 30, 2013. [R. 248-56]. On January 3, 2013, Dr. Berman noted that Plaintiff had pain management issues, was receiving no therapies at the time of the visit, and had received physical therapy, massages, epidurals, and surgery in the past. [DE 256]. Plaintiff reported pain varying between levels of 5 and 10 out of 10. *Id.* Dr. Berman noted that Plaintiff was able to perform activities of daily living and was able to work. *Id.* He also noted that Plaintiff had normal ambulation, had decreased "flex", "ext", "left lat" and "right lat" of the cervical spine, and had spasm and tenderness in the paraspinal muscles. *Id.* In several treatment notes, Dr. Berman wrote that Plaintiff could work and also noted that Plaintiff was able to perform activities of daily living. [R. 248-250; 252-54].

Plaintiff presented to Dr. Berman on August 27, 2013. [R. 308]. He noted that Plaintiff's pain was a 9 without medication and a 5 with medication. *Id.* He also noted that Plaintiff had no side effects from the medications, could perform her activities of daily living, and was able to work. *Id.*

On the same date, August 27, 2013, Dr. Berman completed a Residual Functional Capacity Questionnaire. [R. 271-72]. He explained that he had treated Plaintiff for pain management on a monthly basis for approximately one year. [R. 271]. Dr. Berman stated that Plaintiff's prognosis was "guarded." *Id.* Dr. Berman explained that Plaintiff suffered from neck and

11

shoulder pain and right arm paresthesias, that Plaintiff's symptoms were frequently severe enough to interfere with the attention and concentration required to perform simple work-related tasks, that Plaintiff would need to lie down or recline during a hypothetical workday in excess of the typical breaks, that Plaintiff could only walk one city block without rest or significant pain, that Plaintiff could only sit for 10 minutes at a time, that Plaintiff could only stand or walk for 10 minutes at a time, that Plaintiff could only sit for three hours in a typical workday, that Plaintiff could only stand or walk for two hours in a typical workday, and that Plaintiff would need a job which permits shifting positions at will from sitting, standing, or walking. [R. 271]. Dr. Berman determined that Plaintiff would need to take hourly 10-15 minute breaks during a workday, could only occasionally lift less than 10 pounds and could never lift more than 10 pounds, would have limitations doing repetitive reaching, handling, or fingering, could only use her hands 50% of the time, and could never use her arms to reach. [R. 271-72]. He concluded that Plaintiff is not a malingerer and is not physically capable of working a fulltime job on a sustained basis. [R. 272].

Plaintiff saw Dr. Berman on September 24, 2013. [R. 284]. Dr. Berman noted that Plaintiff suffered from neck pain that she reported as a 9 out of 10 without medicine and a 5 with medicine. *Id.* Dr. Berman also noted that Plaintiff was able to participate in activities of daily living and was able to work. *Id.*

In a Disability Determination Explanation dated October 2, 2013, the State Agency Medical Consultant, Dr. Efren Baltazar, determined that Plaintiff is not disabled. [R. 79-85]. Dr. Baltazar reviewed the record and opined that Plaintiff could perform a range of light work. [R. 83-84]. Dr. Baltazar gave very little weight to Dr. Berman's opinion that Plaintiff was physically incapable of working for an eight-hour workday. [R. 84].

On October 22, 2013, Plaintiff saw Dr. Berman. [R. 307]. At that time, he stated that

Plaintiff could perform her activities of daily living but could not work. *Id.* However, one month later, Dr. Berman's treatment notes for November 19, 2013 state that Plaintiff could perform her activities of daily living and could work. [R. 306]. Dr. Berman's notes from December 17, 2013 state that Plaintiff could perform her activities of daily living, and could not work, but was not disabled. [R. 305].

Dr. Berman's treatment notes from February 11, 2014, state that Plaintiff could perform her activities of daily living but could not work. [R. 304]. On the same date, Dr. Berman completed a Residual Functional Capacity Questionnaire. [R. 287-88]. He explained that he had treated Plaintiff after she had a failed surgery. [R. 287]. Dr. Berman explained that Plaintiff suffered from headaches, neck pain, and dizziness, that Plaintiff's symptoms were constantly severe enough to interfere with the attention and concentration required to perform simple work-related tasks, that Plaintiff would need to lie down or recline during a hypothetical workday in excess of the typical breaks, that Plaintiff could only walk one-half city block without rest or significant pain, that Plaintiff could only sit for 10 minutes at a time, that Plaintiff could only stand or walk for five minutes at a time, that Plaintiff could only sit for two hours in a typical workday, that Plaintiff could only stand or walk for one hour in a typical workday, and that Plaintiff would need a job which permits shifting positions at will from sitting, standing, or walking. [R. 271]. Dr. Berman determined that Plaintiff would need to take hourly 15 minute breaks during a workday, could only occasionally lift less than 10 pounds and could never lift more, would have limitations doing repetitive reaching, handling, or fingering, could only use her hands 20% of the time, could only use her fingers 20% of the time, and could only use her arms to reach 10% of the time. [R. 287-88]. He concluded that Plaintiff is not a malingerer and is not physically capable of working a fulltime job on a sustained basis. [R. 288].

13

On February 11, 2014, Dr. Berman also completed an Onset Date Questionnaire. [R. 289]. He stated that he had treated Plaintiff since January 3, 2013, and that Plaintiff had had the limitations and restrictions outlined in the Residual Functional Capacity Questionnaire since 2012. *Id.*

On March 11, 2014, Plaintiff again saw Dr. Berman. [R. 303]. He noted that Plaintiff had obtained a cervical pillow which helped 50%. *Id.* He also noted that Plaintiff's pain level was a 4 with medication. *Id.* Dr. Berman found that Plaintiff could perform activities of daily living, could not work, and was disabled. *Id.*

## C. ALJ Decision

The ALJ issued her decision on Plaintiff's claim for benefits on October 21, 2014. [R. 18-30]. The ALJ explained the five-step sequential evaluation process for determining whether an individual is disabled. [R. 21-23]. She found that Plaintiff had not engaged in substantial gainful activity since July 3, 2013, the amended application date. [R. 23]. The ALJ then found that Plaintiff suffers from the following severe impairment: cervical spine herniation, status—post-fusion. *Id.* She specifically noted that there was no evidence that Plaintiff had been diagnosed with diabetes, so the diabetes was a non-medically determinable impairment. *Id.* The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* She explicitly determined that there was no evidence of nerve root compression, spinal arachnoiditis, or Plaintiff's inability to ambulate effectively. [R. 24].

The ALJ found that Plaintiff has

the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except, the claimant is limited to occasional stooping, kneeling, crawling, crouching, and climbing ramps and stairs. The claimant is precluded

14

from climbing ladders, ropes, and scaffolds and must avoid exposure to hazards, such as heights. The claimant is also limited to occasional overhead reaching, and limited to frequent handling and fingering.

[R. 24]. The ALJ attested that she had considered all of Plaintiff's symptoms and "the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as all of the opinion evidence. *Id.* She then followed the two-step process—first, determining whether there is an underlying determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, and then evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functions. *Id.* The ALJ summarized Plaintiff's testimony and found that the "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [R. 24-25]. She went through the various records in detail and identified inconsistencies between the record evidence and Plaintiff's testimony at the hearing. [R.25].

The ALJ found that the "[m]edical evidence also reflects that the claimant is not as limited as she alleges." [R. 25]. She summarized Plaintiff's MRI and medical imaging results. *Id.* The ALJ then summarized Dr. Bruce Berman's notes and determined that Dr. Berman's findings that Plaintiff could not work and she was not able to perform her activities of daily living were conclusory and not supported by any explanation. [R. 25-26].

The ALJ acknowledged that Plaintiff had surgery on her cervical spine in January 2010 and that Plaintiff has small central herniated disc protrusions at the T3-4 and T4-5 levels. [R. 26]. The ALJ determined, however, that these findings "do not support the disabling level of

functioning alleged by the claimant", especially since Plaintiff has only "small" central herniated discs with no spinal stenosis. *Id.* The ALJ explained that, although Dr. Berman "noted that the claimant had a decreased range of motion in her cervical spine, and also had spasms and tenderness, Dr. Berman did not provide any explanation for these findings or explain how these specific findings would limit the claimant's functioning." *Id.* The ALJ also explained that Dr. Berman had noted Plaintiff's normal gait and normal joint and neurological examinations and had continued to provide Plaintiff with pain medications that reportedly improved her functioning. *Id.*

With regard to opinion evidence, the ALJ considered the Residual Functional Capacity Questionnaire submitted by Dr. Berman in February 2014. [R. 26]. She summarized all of Dr. Berman's opinions in the questionnaire in detail. *Id.* The ALJ then gave Dr. Berman's opinion little weight because it was conclusory, he did not provide any explanation for his findings, it was inconsistent with the objective medical evidence, Plaintiff's activities of daily living, Dr. Berman's own progress notes, and it was inconsistent with the Residual Functional Capacity Questionnaire Dr. Berman submitted in August 2013. [R. 26-27].

The ALJ also considered in detail the Residual Functional Capacity Questionnaire submitted by Dr. Berman in August 2013 and summarized all of Dr. Berman's opinions in the questionnaire in detail. [R. 27]. Again, the ALJ opted to give Dr. Berman's opinion in the August 2013 questionnaire little weight because it was conclusory, he did not provide any explanation for his findings, it was inconsistent with the objective medical evidence and Dr. Berman's own progress notes, and it was inconsistent with the Residual Functional Capacity Questionnaire Dr. Berman submitted in February 2014. [R. 27].

The ALJ observed that Dr. Berman had written in his notes several times that Plaintiff was

16

unable to work, but had also written in his notes several times that Plaintiff has the ability to work. [R. 27]. The ALJ explained that a finding of disability is reserved to the Commissioner, and that Dr. Berman's opinions regarding whether Plaintiff can work were internally consistent and also inconsistent with the objective medical evidence. *Id.* The ALJ concluded, "[f]or these reasons, the undersigned gives Dr. Berman's opinions about the claimant not being able to work and not being able to work because she is disabled little weight." *Id.*

The ALJ also considered the opinion of State agency medical consultant Efren Baltazar, M.D., who determined that Plaintiff can perform light work. [R. 28]. The ALJ accepted Dr. Baltazar's opinion that Plaintiff can perform light work because it was consistent with the record evidence. *Id.* She stated, however, that the record evidence, including Plaintiff's subjective complaints, "supports that the claimant has additional limitations mentioned in the above-described residual functional capacity. Based on this reason, the undersigned gives Dr. Baltazar's opinion little weight." *Id.*

The ALJ next found that Plaintiff is capable of performing her past relevant work as a retail supervisor and that such work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. [R. 28]. The ALJ accepted the vocational expert's testimony at the hearing in response to the ALJ's hypotheticals. *Id.*

The ALJ also found that, although Plaintiff is capable of performing past relevant work, there are additional jobs existing in the national economy that Plaintiff is also able to perform. [R. 28]. She then made alternative findings for step five the sequential evaluation process. *Id.* The ALJ noted that Plaintiff was a younger individual (18-49 years old) on the date the application was filed, that she has at least a high school education, that she is able to communicate in English, and that transferability of job skills is not material to the determination of disability because the

Medical-Vocational Rules support a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills. [R. 28-29]. The ALJ determined that "[i]n the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 416.969 and 416.969(a))." [R. 29]. She specifically noted that Plaintiff could not perform the full range of light work but had some additional limitations and explained that she had asked the vocational expert about Plaintiff's specific residual functional capacity. *Id.* The ALJ concluded that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of 'not disabled' is therefore appropriate under the framework of the above-cited rule." [R. 29-30]. The ALJ found that Plaintiff has not been under a disability since July 3, 2013, the date the application was filed. [R. 30].

## II. <u>MOTIONS FOR SUMMARY JUDGMENT</u>

In her Motion for Summary Judgment, Plaintiff makes two main arguments. [DE 20]. First, she argues that the residual capacity determination was unsupported by substantial evidence because the ALJ accorded inadequate weight to the treating physician's opinion and relied upon her own interpretation of the medical data. *Id.* Second, Plaintiff asserts that the Step 4 and Step 5 determinations were unsupported by the substantial evidence because the ALJ relied on vocational expert testimony elicited in response to an incomplete hypothetical question. *Id.*

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Response to Plaintiff's Motion for Summary Judgment, she contends that the ALJ properly evaluated the opinions of treating physician Dr. Bruce Berman and rejected them. [DE 21]. Defendant also argues that substantial evidence supports the ALJ's Step 4 and Step 5 determinations. *Id.*

### III. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments.

If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F.2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she is able to perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. Whether the ALJ erred in her consideration of Plaintiff's treating physician

Plaintiff asserts the ALJ improperly discounted the opinion of Dr. Berman, Plaintiff's treating physician and failed to "properly evaluate the consistency of the opinion with the evidence of record, which does contain numerous objective findings supporting Dr. Berman's opinion."

20

[DE 20, p. 9]. Plaintiff contends that the ALJ made an "error of law" by discounting the findings of Dr. Berman which were supportive of his opinion. *Id.* Specifically, Plaintiff argues that "there is significant objective evidence in Dr. Berman's records which support his conclusions, but the ALJ discussed only the portions of treatment notes with normal findings." *Id.* Next, Plaintiff contends that the "ALJ's rejection of the opinions on the grounds that they were inconsistent with one another is misleading." *Id.* at p. 10. Plaintiff also argues that the ALJ failed to perform a proper factor analysis as required by 20 C.F.R. §§ 416.927(c)(2)-(6) in that the ALJ failed to consider the fact that Dr. Berman treated Plaintiff on a regular basis for chronic neck pain with tenderness, spasm, and a limited range of motion. *Id.* at p. 11. Plaintiff contends that there was support for Dr. Berman's opinion through his treatments, examinations, and total care. *Id.* Finally, Plaintiff argues that the ALJ improperly relied on her own assessment of the medical data in determining Plaintiff's limitations and pointed to no evidence to explain the part of the RFC relating to Plaintiff's "ability to perform postural activities, or to reach, handle and finger." *Id.* at pp. 11-12.

Defendant contends that the ALJ discussed Dr. Berman's opinions in detail and "properly rejected them because they are conclusory, inconsistent with Dr. Berman's own treatment notes, inconsistent with the objective evidence in the record, and inconsistent with each other." [DE 21, p. 7]. Defendant asserts that Dr. Berman's opinion is conclusory and inconsistent with his own treatment records because his treatments notes from January to July 2013 contained benign findings, but he filled out a form in August 2013 in which he opined that Plaintiff had disabling limitations. *Id.* at pp. 7-8. Defendant also argues that Dr. Berman's treatment notes from August to November 2013 contradicted his December 2013 finding that Plaintiff was unable to work. *Id.* at p. 8. With regard to the form that Dr. Berman completed in February 2014, Defendant argues

that Dr. Berman's findings contradicted his treatment notes and prior opinion from August 2013. *Id.* at pp. 8-9. Additionally, Defendant maintains that Dr. Berman's opinions are inconsistent with the August 2013 MRI of Plaintiff's cervical spine. *Id.* at p. 9. Finally, Defendant argues that the ALJ's decision is supported by the opinion of the state agency physician, Dr. Baltazar, and, thus, substantial evidence supports the ALJ's RFC finding and her decision to reject Dr. Berman's opinion. *Id.* at pp. 9-10.

The Eleventh Circuit Court of Appeals has explained that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion," but that the ALJ is required "to state with particularity the weight he gives to different medical opinions and the reasons why." *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418-419 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The opinion of a treating physician, such as Dr. Berman, "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis*, 125 F.3d at 1440. "[G]ood cause" exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If the ALJ decides to disregard the opinion of a treating physician, the ALJ must clearly articulate his or her reasons for doing so. *Id.*

As Dr. Berman was a treating physician of Plaintiff, his opinion should have been accorded considerable weight unless the ALJ had good cause to not give it considerable weight and the ALJ clearly articulated her reasons for doing so. Here, the ALJ extensively discussed Dr. Berman's treatment notes and his Residual Functional Capacity Questionnaires in her decision. [R. 25-27]. The ALJ explained that, although Dr. Berman "noted that the claimant had a decreased range of

motion in her cervical spine, and also had spasms and tenderness, Dr. Berman did not provide any explanation for these findings or explain how these specific findings would limit the claimant's functioning." [R. 26]. The ALJ also explained that Dr. Berman had noted Plaintiff's normal gait and normal joint and neurological examinations and had continued to provide Plaintiff with pain medications that reportedly improved her functioning. *Id.* The ALJ gave Dr. Berman's opinion little weight because it was conclusory, he did not provide any explanation for his findings, it was inconsistent with the objective medical evidence, Plaintiff's activities of daily living, and Dr. Berman's own progress notes, and it was inconsistent with the residual capacity questionnaire Dr. Berman submitted in August 2013. [R. 26-27].

The ALJ also observed that Dr. Berman had written in his notes several times that Plaintiff was unable to work, but had also written in his notes several times that Plaintiff has the ability to work. [R. 27]. The ALJ explained that a finding of disability is reserved to the commissioner, and that Dr. Berman's opinions regarding whether Plaintiff can work were internally inconsistent and also inconsistent with the objective medical evidence. *Id.* The ALJ concluded, "[f]or these reasons, the undersigned gives Dr. Berman's opinions about the claimant not being able to work and not being able to work because she is disabled little weight." *Id.*

Thus, the ALJ properly explained that she was giving Dr. Berman's opinion little weight and clearly explained her rationale for that finding. Thus, the only remaining issue is whether the ALJ had good cause for not giving Dr. Berman's opinion considerable weight.

First, opinions on issues reserved to the Commissioner are not entitled to controlling weight or special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 Fed. App'x 875, 878 (11th Cir. 2013). Therefore, the ALJ was not required to rely on Dr. Berman's conclusion that Plaintiff was disabled.

Moreover, the ALJ is correct that Dr. Berman's opinion was inconsistent with the objective medical evidence, Plaintiff's activities of daily living, and his own progress notes. [R. 26-27]. On January 3, 2013, Dr. Berman noted that Plaintiff had pain management issues, was receiving no therapies at the time of the visit, and had received physical therapy, massages, epidurals, and surgery in the past. [DE 256]. Dr. Berman wrote that Plaintiff was able to perform activities of daily living and was able to work. *Id.* He also noted that Plaintiff had normal ambulation, had decreased "flex", "ext", "left lat" and "right lat" of the cervical spine, and had spasm and tenderness in the paraspinal muscles. *Id.* In several later treatment notes from 2013, Dr. Berman wrote that Plaintiff was allowed to work and also noted that Plaintiff was able to perform activities of daily living. [R. 248-250; 252-54].

On August 27, 2013, Dr. Berman noted that Plaintiff had no side effects from the medications, could perform her activities of daily living, and was able to work. [R. 308]. On the same date, Dr. Berman completed a Residual Functional Capacity Questionnaire. [R. 271-72]. He stated that Plaintiff's prognosis was "guarded." *Id.* Dr. Berman explained that Plaintiff suffered from neck and shoulder pain and right arm paresthesia, that Plaintiff's symptoms are frequently severe enough to interfere with the attention and concentration required to perform simple work-related tasks, that Plaintiff would need to lie down or recline during a hypothetical workday in excess of the typical breaks, that Plaintiff could only walk one city block without rest or significant pain, that Plaintiff could only sit for 10 minutes at a time, that Plaintiff could only stand or walk for 10 minutes at a time, that Plaintiff could only sit for three hours in a typical workday, that Plaintiff could only stand or walk for two hours in a typical workday, and that Plaintiff would need a job which permits shifting positions at will from sitting, standing, or walking. [R. 271]. Dr. Berman determined that Plaintiff would need to take hourly 10-15

minute breaks during a workday, could only occasionally lift less than 10 pounds and could never lift more, would have limitations doing repetitive reaching, handling, or fingering, could only use her hands 50% of the time, and could never use her arms to reach. [R. 271-72]. He concluded that Plaintiff is not a malingerer and is not physically capable of working a fulltime job on a sustained basis. [R. 272]. Thus, his August 27, 2013 Residual Functional Capacity Questionnaire responses were inconsistent with his treatment notes from the very same date in that he noted that Plaintiff could work and carry out activities of daily living in his treatment notes but then found that she had many physical limitations and could not work in his Questionnaire responses.

On September 24, 2013, Dr. Berman noted that Plaintiff was able to participate in activities of daily living and was able to work. [R. 284]. In his October 22, 2013 treatment notes, Dr. Berman stated that Plaintiff could perform her activities of daily living but could not work. [R. 307]. Dr. Berman's treatment notes for November 19, 2013, however, state that Plaintiff could perform her activities of daily living and could work. [R. 306]. Dr. Berman's notes from December 17, 2013, state that Plaintiff could perform her activities of daily living, and could not work, but that Plaintiff was not disabled. [R. 305].

On February 11, 2014, Dr. Berman noted that Plaintiff could perform her activities of daily living but could not work. [R. 304]. On the same date, he completed a Residual Functional Capacity Questionnaire. [R. 287-88]. He explained that Plaintiff suffered from headaches, neck pain, and dizziness, that Plaintiff's symptoms are constantly severe enough to interfere with the attention and concentration required to perform simple work-related tasks, that Plaintiff would need to lie down or recline during a hypothetical workday in excess of the typical breaks, that Plaintiff could only walk one-half city block without rest or significant pain, that Plaintiff could

only sit for 10 minutes at a time, that Plaintiff could only stand or walk for five minutes as a time, and that Plaintiff could only sit for two hours in a typical workday, that Plaintiff could only stand or walk for one hour in a typical workday, and that Plaintiff would need a job which permits shifting positions at will from sitting, standing, or walking. [R. 271]. Dr. Berman determined that Plaintiff would need to take hourly 15 minute breaks during a workday, could only occasionally lift less than 10 pounds and could never lift more, would have limitations doing repetitive reaching, handling, or fingering, could only use her hands 20% of the time, could only use her fingers 20% of the time, and could only use her arms to reach 10% of the time. [R. 287-88]. He concluded that Plaintiff is not a malingerer and is not physically capable of working a fulltime job on a sustained basis. [R. 288]. Dr. Berman's findings in the February 11, 2014 questionnaire were quite different from his findings in the August 27, 2013 questionnaire.

On February 11, 2014, Dr. Berman also completed an Onset Date Questionnaire. [R. 289]. He stated that he had treated Plaintiff since January 3, 2013, and that Plaintiff has had the limitations and restrictions outlined in the Residual Functional Capacity Questionnaire since 2012. *Id.* However, a review of Dr. Berman's treatment notes and his 2013 questionnaire responses evidence that he had not found Plaintiff to be that limited and restricted since 2012. Finally, on March 11, 2014, Plaintiff saw Dr. Berman. [R. 303]. He noted that Plaintiff had obtained a cervical pillow which reduced her pain by 50%. *Id.* He also noted that Plaintiff's pain level was a 4 with medication. *Id.* Dr. Berman found that Plaintiff could perform activities of daily living, could not work, and was disabled. *Id.*

As laid out in detail above, Dr. Berman's treatment notes and questionnaire responses were internally inconsistent and did not show a clear trend toward Plaintiff's conditions worsening over time. The ALJ had good cause to give Dr. Berman's opinion little weight.

Furthermore, Dr. Berman's findings contradicted the other record evidence. A July 16, 2009, MRI of Plaintiff's cervical spine revealed extruded disc herniation at the C5-6 level, mild disc space narrowing with residual hydration in the disc, a posterior subligamentous extrusion/herniation of the disc seen centrally with the disc extending into the collar direction by approximately 6 mm from the disc space, patent neural foramina, and a bulging disc at C4-5. [R. 354]. The MRI of the lumbar spine revealed a bulging disc at L5-S1 with mild disc dehydration at L5-S1, mild neural impingement to the left existing nerve root, and a posterior bulge seen at L5-S1 centrally with mild encroachment on the left exiting S1 nerve root. [R. 355].

On January 26, 2010, Plaintiff underwent surgery—an anterior C4-5, C5-6 decompression, fusion, and anterior instrumentation. [R. 343-45]. On February 16, 2010, Plaintiff's postoperative lateral cervical spine film showed that Plaintiff's anterior plate was intact from C4 through C6, that there had been no displacement of the plate from the anterior surface of the vertebral bodies, that the PEEK spacers were in good position at C4-5, and that there had been a slight subsidence at C5-6. [R. 342]. On February 16, 2010, Dr. Rousch noted that the incision was healing, muscle strength and grip strengths were normal, and sensation was equal and intact in the upper extremities. [R. 341]. On March 17, 2010, Dr. Gomez noted that Plaintiff's scar was well-healed, her range of motion of the cervical spine was slowly improving, her strength was 5/5 bilaterally, her gait was normal, and she had tenderness overlying the spinous process of C7-T1. [R. 338].

On May 25, 2011, Dr. Levy noted that Plaintiff had no obvious pain with her gait, a steady stance, palpation, tenderness, and positive spasms of the cervical and lumbar spines, limited range of motion of the cervical and lumbar spines guarded by pain, a negative bilateral straight leg raise test, sensation paresthesias in both arms, full range of motion in her upper extremities, 5+/5

strength test for her upper extremities, and normal range of motion and normal strength and tone to her lower extremities.   [R. 336].

On August 8, 2011, Plaintiff had an MRI of the cervical spine performed.   [R. 264].   The radiologist determined that there was evidence of previous anterior and interbody fusion at C4-C5 and C5-C6; the C3-C4 and C4-C5 disc space levels demonstrated previous anterior and interbody fusion; there was no herniated disc, spinal stenosis, or abnormal neural foramina at the C3-C4 or C4-C5 disc space levels; the T3-T4 disc space level demonstrated a central herniated disc protrusion measuring 2 mm x 2 mm in size that did not indent the cord; there was no spinal stenosis or abnormal foramina at the T3-T4 or T4-T5 disc space levels; and the T4-T5 disc space level demonstrated a bilobular herniated disc protrusion with right paracentral and left paracentral components measuring 2 mm x 3 mm in size that did not indent the cord.   [R. 264-65].

On September 8, 2011, Dr. Gomez performed a physical examination on Plaintiff and noted palpable increased tone and tenderness in the paraspinal muscles in the posterior cervical region, increased tone and tenderness over the medial trapezius and supraclavicular region, tenderness over the left upper pectoral region and pectoral-deltoid groove, diminished range of motion with abduction on the left shoulder, and an inability to fully abduct her left shoulder.   [R. 262].   Dr. Gomez also found that Plaintiff's gait is normal, her scar is well-healed, her biceps, triceps, and interosseous strength is 5/5 bilaterally, and her motor testing is 5/5 in both lower extremities.   *Id.*   Dr. Gomez determined that Plaintiff had reached maximal medical improvement.   *Id.*   He explained that the most recent MRI showed a satisfactory fusion of C4 through C6, there was no residual spinal cord compression from C4 through C6, and the adjacent segments of C3-4 and C6-7 showed no evidence of adjacent-segment degeneration.   [R. 263].

On February 29, 2012, Plaintiff had a lateral cervical spine x-ray performed.   [R. 329].

She was determined to have no compression fracture deformities, no lytic or blastic bone lesions, mild anterior osteophyte formation at C3-4, and normal prevertebral soft tissues. *Id.* On March 12, 2012, Dr. Gomez noted that Plaintiff had a solid fusion of C4 through C6, an intact anterior instrumentation, and heterotopic ossification and calcification along the anterior annulus and anterior longitudinal ligament at C3-4. [R. 328]. He also found that Plaintiff had increased tone and tenderness over the posterior cervical, trapezius, and suprascapular region, but she had motor testing of 5/5 in the upper and lower extremities and a well-healed anterior cervical scar. *Id.*

On July 10, 2012, Plaintiff reported to Dr. Hoffman diminished pain (a 5/10) and improved activities of daily living when taking her medications. [R. 294]. Plaintiff stated that she was self-employed and able to work. *Id.* She reported no adverse side effects from the medications. *Id.* On September 5, 2012, Plaintiff again reported diminished pain and improved activities of daily living when taking her medications. [R. 293]. She also reported no adverse side effects from the medications. *Id.* On November 27, 2012, Plaintiff reported that her medications continued to provide relief, that she had a good month, that she could conduct her online business, and that her pain was a 4 out of 10 with medication. [R. 291]. She denied any adverse effects from the medications and stated that she could carry out her daily activities. *Id.*

In a Disability Determination Explanation dated October 2, 2013, Dr. Baltazar determined that Plaintiff is not disabled. [R. 79-85]. Dr. Baltazar reviewed the record and opined that Plaintiff could perform a range of light work. [R. 83-84]. He gave very little weight to Dr. Berman's opinion that Plaintiff was physically incapable of working for an eight-hour workday. [R. 84].

Taking into account all of the record evidence, the ALJ had good cause to give Dr. Berman's opinion little weight on the basis that it was contradicted by the other record evidence.

Moreover, the ALJ's finding was supported by Dr. Efren Baltazar's finding that Plaintiff could perform light work. The ALJ explained in her decision that she accepted Dr. Baltazar's opinion that Plaintiff can perform light work because it was consistent with the record evidence. [R. 28]. She stated, however, that the record evidence, including Plaintiff's subjective complaints, "supports that the claimant has additional limitations mentioned in the above-described residual functional capacity. Based on this reason, the undersigned gives Dr. Baltazar's opinion little weight." *Id.* In other words, the ALJ generally accepted Dr. Baltazar's finding that Plaintiff could perform light work, but then actually found that Plaintiff was more limited than Dr. Baltazar believed Plaintiff to be.

Finally, with regard to activities of daily living, Plaintiff reported to Dr. Hoffman on July 10, 2010, September 5, 2012, and November 27, 2012, that she could carry out activities of daily living. [R. 291, 293, and 294]. Moreover, as recently as March 11, 2014, a second doctor, Dr. Berman, noted that Plaintiff could perform activities of daily living. [R. 303]. Additionally, Plaintiff testified at the April 21, 2014 hearing that, on an average day, she gets up, does chores, goes to the grocery store, gets herself ready, spends some time with her teenage daughter, and prepares meals. [R. 45]. Plaintiff stated that she does drive, but only to the market and only approximately twice a week. [R. 63]. Thus, Plaintiff's activities of daily living also properly served as a basis for the ALJ to give Dr. Berman's opinion little weight.

This is not a case in which the ALJ analyzed the medical evidence on her own and came to her own conclusion based on her own assessment of the raw medical data. *Sneed v. Comm'r of Soc. Sec.*, No. 6:13-CV-1453-ORL-TBS, 2015 WL 1268257, at *6 (M.D. Fla. Mar. 19, 2015) (citing *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir.1992)) ("The ALJ may not 'play doctor' by substituting her own uninformed medical evaluations" for that of a medical professional.")

The ALJ based her RFC on the substantial evidence.

Dr. Baltazar's RFC determination was that Plaintiff could perform light work with no other limitations. *See* R. 83-84; 20 C.F.R. § 416.967. In the ALJ's RFC, she added limitations including that Plaintiff could only occasionally stoop, kneel, crawl, crouch, and climb ramps and stairs. [R. 24]. The ALJ also found that the Plaintiff is precluded from climbing ladders, ropes, and scaffolds and must avoid exposure to hazards, such as heights. *Id.* Finally, the ALJ found that Plaintiff is also limited to occasional overhead reaching, and limited to frequent handling and fingering. *Id.* The limitations regarding reaching, handling, or fingering came directly from Dr. Berman's RFC. [R. 272; 288]. Additionally, the ALJ explained in her decision that she added the other limitations based on the record evidence, including Plaintiff's subjective complaints. [R. 28]. Despite these additional limitations, the ALJ found that Plaintiff could perform her prior work and other work in the national economy. [R. 28-29]. The ALJ's RFC and decision were clearly supported by substantial evidence. Even if the ALJ had committed error by adding additional limitations that were not part of Dr. Baltazar's RFC, this would be harmless error. *See Hoffman v. Astrue*, 259 F. App'x 213, 217 (11th Cir. 2007). It would lead to absurd results if the ALJ's decision were reversed and remanded simply because she opted to give Plaintiff the benefit of the doubt and include more limitations than Dr. Baltazar did.

B. Whether the ALJ erred in relying on the vocational expert testimony

Plaintiff argues that the ALJ improperly relied on the vocational expert's testimony in determining that Plaintiff could perform past relevant work as a retail manager. [DE 20, p. 14]. Plaintiff contends that the vocational expert's testimony did not "constitute substantial evidence because it was elicited in response to an incomplete hypothetical question." *Id.* Plaintiff further asserts that the hypothetical question posed to the vocational expert did not properly account for all

of Plaintiff's limitations, including many provided by Dr. Berman. *Id.* Finally, Plaintiff argues that "[t]his holds true for the alternative Step 5 finding that there is other work in the national economy that Plaintiff can perform, because that conclusion was likewise based upon vocational expert testimony elicited in response to an incomplete hypothetical question." *Id.*

Defendant argues in response that "Plaintiff's second argument requires the Court to accept her first argument regarding Dr. Berman's opinion." [DE 21, p. 10]. Defendant contends that the ALJ was not required to include any additional limitations in the hypothetical as the ALJ had properly rejected them as unsupported. *Id.* According to Defendant, the testimony of the vocational expert "was based upon a consideration of all the relevant evidence and in responses to a hypothetical question that fairly set out all of Plaintiff's credible limitations." *Id.*

An ALJ may utilize the services of a vocational expert to make a determination of whether a claimant can perform their past relevant work, given the claimant's residual functional capacity. 20 C.F.R. § 404.1560(b)(2). "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Gordon v. Astrue*, 249 Fed.Appx. 810 812 (11th Cir. 2007). However, the ALJ need only include in the hypothetical claimant's impairments that the ALJ has found to be supported by the evidence. *Id.* at 813.

The ALJ's first hypothetical to the vocational expert was regarding an individual of the same age, education, and work experience as Plaintiff who had the following limitations: work at the light level only; occasional stooping, kneeling, crawling, crouching and climbing; climbing ramps and stairs, but not ladder, ropes or scaffolds; avoiding hazards such as heights; and occasional overheard reaching. [R. 66]. The vocational expert explained that such an individual would be able to perform as both a retail supervisor and as a nail technician as both jobs are

generally performed. *Id.* He stated that such an individual could also perform light, unskilled work as, for example, a production assembler, a cleaner, or a fast food worker. [R. 67]. The vocational expert testified that the general employer off-task tolerance for a typical workday would be about 20%. *Id.* He also testified that two or greater absences per month would impact the ability to maintain work. [R. 68].

The ALJ posed a second hypothetical in which an individual had the same limitations stated before but was also limited to frequent handling and frequent fingering (rather than constant handling or fingering). [R. 68]. The vocational expert testified that such an individual would still be able to perform the retail supervisor job, but would not be able to perform the nail technician job. *Id.* Such an individual would also be able to perform the cleaner and the assembler jobs, but not the fast food worker job. *Id.*

The ALJ determined that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except Plaintiff is limited to occasional stooping, kneeling, crawling, crouching, and climbing ramps and stairs, is precluded from climbing ladders, ropes, and scaffolds, must avoid exposure to hazards, such as heights, is limited to occasional overhead reaching, and is limited to frequent handling and fingering. [R. 24]. This residual functional capacity is supported by the record evidence, and, as explained in detail above, the ALJ did not err in giving the opinion Plaintiff's treating physician, Dr. Berman, little weight.

The limitations contained within the ALJ's hypotheticals are the same as those contained within the ALJ's RFC for Plaintiff. The hypothetical questions presented to the vocational expert by the ALJ were consistent with the medical record evidence and other evidence. Thus, the Court finds that the ALJ's hypotheticals to the vocational expert properly comprised all of Plaintiff's impairments. The hypotheticals were not incomplete, and the ALJ properly relied on the

vocational expert's testimony in determining that Plaintiff is not disabled.

## IV. <u>CONCLUSION</u>

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 20] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 21] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 24th day of May , 2017.

WILLIAM MATTHEWMAN
United States Magistrate Judge